U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the order of the Court.**

**Signed July 11, 2006**

_[signature]_

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JESSE LEE REESE, | § | CASE NO. 06-50133-RLJ-11 |
| | § | |
| DEBTOR | § | |

## <u>MEMORANDUM OPINION</u>

On July 6 and 7, 2006, the Court jointly heard the debtor's Motion for Authority to
Accept Executory Contracts for the Sale of Real and Personal Property and to Sell Real and
Personal Property Free and Clear of Liens (the "Motion to Accept and Sell") and the debtor's
Motion and Notice of Debtor's Request for Approval of Agreed Order for Use of Cash Collateral
(the "Motion to Use Cash Collateral"). The debtor's wife, Lexie Reese, objects, at least in part, to
the relief requested by the debtor under the two motions. The Court hereby addresses each of
the two motions, along with a third motion, the debtor's Motion for Authority to Obtain Secured
Credit Pursuant to the Provisions of 11. U.S.C. § 364(b)(1) (the "Motion for Secured Credit").

No objections were filed to the Motion for Secured Credit but, as will be addressed, such motion is specifically related to the Motion to Use Cash Collateral.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## Background

On May 4, 2006, Jesse Reese and certain farm corporations with which he is affiliated, specifically Savage Area Farms, Inc. ("Savage"), Pleasant Valley Farms, Inc. ("Pleasant Valley"), Fairview Area Farms, Inc. ("Fairview"), and CNR Gin, Inc. ("Gin"), entered into a workout and settlement agreement (the "Workout Agreement") with State National Bank ("SNB"). Under the terms of the Workout Agreement, Reese and the farm corporations acknowledge that various promissory notes (both notes in which Reese is the maker and notes in which one of the farm corporations is the maker but are guaranteed by Reese) owing to SNB were then in default; that the indebtedness represented by the notes is secured by farm machinery and equipment, government payments, and by a deed of trust granting SNB a lien against tracts of real property totaling approximately 4,324 acres of land owned by Reese. The Workout Agreement provides for an orderly liquidation of Reese's assets as a means to address the indebtedness owed to SNB, as well as debts owed to other secured creditors holding prior liens against the various tracts of land. The Workout Agreement specifically contemplates that Reese file a chapter 11 proceeding and proceed with an orderly liquidation of his properties under chapter 11. A liquidation under chapter 11 was deemed necessary by Reese and SNB to accomplish the sales of real properties owned by Reese. Reese and his wife, Lexie Reese, are going through divorce proceedings and

she, according to Reese, has not been amenable to the sales.  Reese and SNB agreed that, subject to the bankruptcy court's approval, Reese would be authorized to use cash collateral; that SNB would be granted replacements liens on the 2006 crops, including crop proceeds and government payments; that SNB would subordinate its replacement liens to an extent up to $100,000 to facilitate Reese obtaining $100,000 in additional secured trade credit; that Reese would obtain approval from the bankruptcy court of the employment of Scott Land Company, a real estate company, to assist him in liquidating the 4,324 acres of land; that Reese would seek to sell the items of real estate, if necessary, under section 363(h) of the Bankruptcy Code; that as additional adequate protection, Reese would pledge the so-called Jason's Deli property located in the city of Lubbock, Texas, and; that SNB would allow a "carve-out" of up to $100,000 from the proceeds of collateral for Reese's use in the payment of attorney's fees owing to his bankruptcy counsel, Mullin, Hoard & Brown.

In accordance with the Workout Agreement, Reese filed this chapter 11 case on June 13, 2006.  On the same date, Reese filed the Motion to Accept and Sell, the Motion to Use Cash Collateral, and the Motion for Secured Credit.  At a hearing held on June 22, 2006, the Court approved Reese's employment of Scott Land Company as real estate brokers to assist in selling the various tracts of real property.  Under the Motion to Accept and Sell, Reese seeks authority to accept four contracts of sale, each of which contemplate a sale of real property owned by Reese. The four contracts all concern property located in Crosby County, Texas, and are described as follows:

(1) The "Payne" contract between Reese and Jeff Payne, dated March 31, 2006, which provides for the sale of the so-called "Pleasant Hill" property, a 640-acre tract, for a sales price of

- 3 -

$480,000 or $750 an acre. By extension agreement, the required date of closing is on or before July 31, 2006.

(2) The "Roye" contract between Reese and Bart Roye, dated March 22, 2006, which provides for the sale of the "Chron" property, a 480-acre tract, for a sales price of $240,000, or $500 an acre. This sale must close on or before July 21, 2006.

(3) The "Garrett" contract between Reese and Phil Garrett, dated May 25, 2006, which provides for the sale of the "Ragle" and "Home" properties, 404-acre and 197-acre tracts, for a sales price of $375,625 or $625 an acre. This contract must close on or before August 18, 2006.

(4) The "Cobb" contract between Reese and Gary Cobb, dated June 12, 2006, which provides for the sale of the "Exum" property, a 320-acre tract, for a sales price of $160,000 or $500 an acre. This sale is required to close on or before July 31, 2006.

Earnest money deposits have been made on each of the four contracts and title commitments have been issued on the Payne, Roye, and Garrett sales, and will be issued shortly on the Cobb sale.

Each of the properties that are subject of the sales are encumbered by multiple liens. The Pleasant Hill property, subject of the Payne contract, is subject to a first lien in favor of AXA Equitable Life Insurance Company ("Equitable"), with an alleged indebtedness of $252,562; a second lien in favor of Plains Capital Bank ("Plains Capital") securing an alleged debt of $334,957; a third lien in favor of SNB securing an indebtedness of $1,714,978.64. The Chron property, subject of the Roye contract, is encumbered by a first lien in favor of Equitable in the alleged amount of $377,069; a second lien in favor of SNB securing an indebtedness of $1,714,978.64. The Ragle/Home properties, subject of the Garrett contract, is encumbered by a

- 4 -

first lien in favor of Equitable in the alleged amount of $377,069, and a second lien in favor of

SNB to secure its debt of $1,714,978.64. The Exum property, subject of the Cobb contract is

encumbered by a first lien in favor of FirstCity Servicing for an alleged debt of $249,000; a

second lien in favor of Plains in the alleged amount of $334,957; and the third lien in favor of

SNB securing its debt of $1,714,978.64. In addition, an abstract of judgment filed by the Texas

Boll Weevil Association in the approximate amount of $61,000 has been filed of record, along

with federal tax liens. The IRS has filed a proof of claim in this bankruptcy case on June 27,

2006, in the amount of $686,478.01. Finally, ad valorem taxes for years 2004 and 2005 have not

been paid on the Ragle and Home properties and ad valorem taxes for 2005 have not been paid

on the Pleasant Hill and Chron properties.

 Reese entered into the listing contract with Scott Land Company on February 16, 2006.

Scott Land Company marketed the various properties for sale, which resulted in the four

contracts of sale described above. On or around March 1, 2006, Scott Land Company provided

Reese with its estimated values and suggested listing prices on the various items of property

owned by Reese. In this regard, Scott Land Company addressed eleven separate tracts of which

four (counting Ragle and Home as one tract) are subject of the four contracts of sale. Scott Land

stated an estimated price on the Pleasant Hill property (the Payne contract) of $704,000 or $1,100

an acre; on the Chron property (the Roye contract), Scott Land provided an estimated price of

$264,000 or $550 an acre; on the Ragle/Home property (the Garrett contract) it provided an

estimated price of $450,750 or $750 an acre; and on the Exum property (the Cobb contract) it

provided an estimated price of $304,000 or $950 an acre. Reese and Scott Land Company

agreed, with respect to each tract, to both a slightly higher listing aspirational price and a

significantly lower bottom line price. With respect to the Pleasant Hill property, the aspirational price was $1,250 an acre and the bottom line price was $750 an acre; with respect to the Chron property, the aspirational price was $650 an acre and the bottom line price was $500 an acre; with respect to the Ragle/Home tracts, the aspirational price was $850 an acre and a bottom line price of $700 an acre; with respect to the Exum property, the aspirational price was $850 an acre and a bottom line price of $700 an acre. The contracts on both the Payne and the Roye properties thereby reflect the bottom line price, while the Garrett and Cobb contracts are lower than even the bottom line price. With respect to the Garrett contract, as stated above, the price per acre of $625 is $75 less than the bottom line price. The Cobb contract is $200 an acre less than the bottom line price. With respect to the Exum property, Scott Land Company and Reese hoped to take advantage of the property's canyon frontage to attract buyers who might want to purchase the property for its scenic and recreational aspects. The property was ultimately sold for agricultural purposes. A formal appraisal has not been performed on any of the properties.

Although this chapter 11 case was filed for the purpose of effecting an orderly liquidation of Reese's assets, specifically including the 4,000 plus acres of real property that he owns, it also contemplates continued farming operations on the properties that are not subject of the four sales as a means to generate income for Reese and, ultimately, to enhance the remaining properties' values and marketability. To facilitate this effort, Reese requests by the Motion to Use Cash Collateral that this Court approve a proposed agreed order regarding the use of cash collateral (the "Agreed Cash Collateral Order"). However, the Agreed Cash Collateral Order is much broader than a simple cash collateral order. The request made by Reese and SNB under the Agreed Cash Collateral Order is that Reese be allowed to use cash collateral consisting of FSA

- 6 -

payments (government payments), both advance and other FSA funds, in a manner consistent with Reese's projected budget and cash flows attached as exhibit "D" to the Agreed Cash Collateral Order. Exhibit "D" reflects a cash flow generating total revenues for cotton and FSA payments (direct and countercyclical payments) totaling $293,626. *See* Ex. 13. It also contemplates expenses for the 2006 crop year, running from June, 2006 through March, 2007, of $235,000. Reese and SNB propose that, in exchange for the use of cash collateral, SNB be granted a replacement lien against the crops growing or to be grown in 2006 and the 2006 FSA payments. In addition, SNB proposes that it subordinate its replacement liens against crops and FSA payments for up to $100,000 in secured trade credit to be used by Reese to plant, cultivate, and harvest 2006 crops, and to keep the balance of his farmland clean and properly maintained for sale. Approval of the $100,000 in secured trade credit is requested by the Motion for Secured Credit.

SNB and Reese agree that Reese may continue the use of farm machinery and equipment subject of SNB's security interest. As additional adequate protection to secure Reese's continued use of SNB's collateral, including the cash collateral, Reese proposes to grant a deed of trust lien against his community interest in the so-called Jason's Deli property located in Lubbock, Texas. In his schedules, Reese listed the Jason's Deli property as having a value of $906,366, encumbered by a lien in favor of Wells Fargo Bank, securing an indebtedness of $700,000.[1] At least one appraisal has been done on the Jason's Deli property reflecting a value of approximately $1 million. The property is listed by the Lubbock Central Appraisal District as

---

[1]The schedules reflect that a CD also secures the Wells Fargo indebtedness and thus reflect a total value for both the Jason's Deli property and the CD of $1,092,366.

having an assessed value of $927,182. Reese testified that he thought the property could be worth as much as $1.2 million.

Finally, by the terms of the Agreed Cash Collateral Order, SNB agrees to a "carve-out" of up to $100,000 from proceeds of its collateral for Reese's use in payment of attorney's fees to Mullin, Hoard & Brown incurred during this chapter 11 proceeding. The carve-out is subject to SNB's right to object to any requested fees and expenses on the grounds of reasonableness and/or necessity.

**Discussion**

(1)  Motion to Accept and Sell

Reese, as debtor-in-possession, is authorized to sell the properties subject of the four contracts of sale. Section 541(a)(2) of the Bankruptcy Code provides that the bankruptcy estate includes all interests of the debtor and the debtor's spouse in community property that is under the sole, equal, or joint management and control of the debtor. 11 U.S.C. § 541(a)(2).[2] Section 363(b) allows the debtor in possession to use, sell, or lease, other than in the ordinary course of business, property of the bankruptcy estate. 11 U.S.C. § 363(9b); *see also In re Hendrick*, 45 B.R. 967, 987 (Bankr. M.D. La. 1995). Lexie Reese does not object to Reese selling the properties as a means of addressing the overwhelming debts that he has. She simply contends that the sales are too quick and have not achieved the best value for the properties. As a spouse, Lexie Reese has a right under section 363(i)  to purchase the properties at the contract price. *Id*. Section 363(i) states, "[b]efore the consummation of a sale of property to which subsection (g) or

---

[2]As this case was filed June 13, 2006, all references and citations to the Bankruptcy Code are to the Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which applies to all cases filed on or after October 17, 2005.

(h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated." The right of first refusal was also explained in *In re Hendrick*, supra. The court stated, "[i]n § 363(i), Congress allowed a 'first right of refusal' to co-owners when property is sold under § 363(h), and *also allowed* such a first right of refusal to the non-debtor spouse with respect to community property that is property of the estate." *In re Hendrick*, 45 B.R. at 988 (emphasis in original). If Lexie Reese believes the contract prices are too low, she retains a statutory right of first refusal allowing her to buy the properties at the contract price. Lexie Reese has not, however, expressed any willingness or indicated an ability to purchase the properties.

The Court, therefore, considers whether the sales are, under the totality of the circumstances, fair and reasonable and reflect good business judgment. 3 L. King, COLLIER ON BANKRUPTCY ¶ 363.02[1][f] at 363-16 (15th Ed. Revised 2005). In this regard, Reese is, to put it mildly, in dire financial straits. While he and SNB have presented a proposal for the use of cash collateral, Reese does not, at present, have any funds, i.e. any cash collateral, that has been generated to finance a farming operation for 2006 or even sufficient funds to maintain the properties for purposes of marketing them for sale. The properties are deteriorating daily. They are infested with weeds and have not been properly prepared for planting. Reese's projections for 2006 can only be described as speculative. A comparison of Reese's projected budget and cash flows attached to the May 4, 2006 Workout Agreement to the projected budget and cash flows attached to the Agreed Cash Collateral Order submitted to the Court at the hearing reveals

- 9 -

that Reese's projected cash flow has reduced from $531,772 to $293,626, while his projected expenses have increased from $200,000 to $235,000. *See* Exs. 13 and 25. Moreover, while Reese's expenses have increased, the amount of acreage he proposes to farm has been reduced given the lack of available funds with which to farm. In short, the Court is not optimistic that Reese will be able to meet even his most recent projections. Reese's circumstance, therefore, underscores the need to proceed as quickly as possible with liquidation of his properties as a means of avoiding the expenses associated with holding the properties. The secured creditors – SNB, Equitable, and FirstCity Servicing Corporation – obviously recognize this dilemma given their approval of the sales. The four sales will not generate any equity for Reese or unsecured creditors. The sales simply reduce, or perhaps eliminate, the prior secured debt held by Equitable, Plains Capital, and FirstCity Servicing, which, in turn, improves SNB's position on the remaining properties held by Reese. The Court assumes that SNB acts rationally and has an incentive to maximize its recovery. Quick sales may indeed fail to maximize the price obtained, but this effect must be balanced against the reality of Reese's circumstance. A longer holding period translates to greater holding costs that will have to be paid with funds that Reese does not presently have. The Court is satisfied that the four sales here, while perhaps not attracting the kinds of values that could be achieved under a prolonged marketing of the properties, have resulted in prices considerably higher than a series of foreclosure sales. The Court concludes the sales are, under the circumstances, fair and reasonable and reflect a sound business judgment.

(2) Motion to Use Cash Collateral

The main area of dispute regarding Reese's agreement with SNB and the use of cash collateral concerns his pledge of his interest in the Jason's Deli property. As was clarified at the

- 10 -

hearing, the pledge of the Jason's Deli property serves only to further adequately protect SNB for Reese's use of both cash collateral and the farm machinery and equipment. The agreement between the parties further provides that the replacement liens and pledge of the Jason's Deli property is in consideration of SNB's agreement not to pursue an objection to Reese's discharge. Upon review of both the Workout Agreement and the Agreed Cash Collateral Order, the Court is satisfied that the parties' agreement is an overall global settlement and that the various agreements flowing back and forth are not intended to, in effect, be matched with one another. The pledge of the Jason's Deli property is not specifically in exchange for SNB's promise not to pursue an objection to discharge.

The Agreed Cash Collateral Order frees up cash for the debtor's operations and properly grants adequate protection for the debtor's use of the cash. The subordination to secured trade credit further enhances the debtor's cash needs. The Court concludes that the best interest of the debtor's estate and his creditors is served by approving the terms of the Agreed Cash Collateral Order. This approval is qualified in three ways, however. First, the pledge of the Jason's Deli property, which as stated constitutes adequate protection for Reese's use of SNB's collateral (including cash collateral) in his farming operations, shall not constitute additional security to SNB for its agreed carve-out of $100,000 for attorney's fees and expenses. It is unclear to the Court whether this was intended or not. Regardless, the Court considers it improper if intended as it would effectively constitute a post-petition pledge of unencumbered property (at least potentially partially so) for a loan to pay attorney's fees. This is purely academic if excess funds result from Reese's 2006 operations and Reese's attorney's fees and expenses are the sole administrative costs in the case. Second, the Agreed Cash Collateral Order states that it is not

- 11 -

"intended to contradict or alter in any manner the prior agreements between the parties." This is a reference to the Workout Agreement. The Court will not approve a form of order that defers to a separate document that is not part of the order or that is inconsistent or contrary to the Court's order. Third, the Court requires that debtor's counsel, within twenty-four hours from entry of the Agreed Cash Collateral Order (as hereby modified), forward a copy of the Agreed Cash Collateral Order to all creditors and parties in interest with a notice that they have fifteen days to file a motion seeking reconsideration of the order if they have an objection to the terms of the order and that, if a motion is filed, a hearing on the motion will be held on August 4, 2006, at 10:00 A.M., before the bankruptcy court in Lubbock, Texas. This right to file a motion within fifteen days does not apply to Lexie Reese or any other party that participated in the hearings held July 6-7, 2006. It does not eliminate or diminish any rights Lexie Reese or other participating parties may have to file any motion authorized by the Bankruptcy Code or the Rules of Bankruptcy Procedure, including, without limitation, motions under Rules 59 and 60 of the Rules of Federal Procedure as incorporated by Rules 9023 and 9024 of the Rules of Bankruptcy Procedure, respectively.

     (3) Do the Debtor's Motions Constitute a *Sub Rosa* Plan?

     The Court does not agree with Lexie Reese's argument that the debtor's motions are, in effect, an improper *sub rosa* plan. The sales here account for only four of the debtor's eleven tracts. The Court has explained in detail the necessity of proceeding with relatively quick sales. There are no terms of the sales that dictate future requirements of a chapter 11 plan. In *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998), the court, addressing Fifth Circuit law on this issue, had this to say:

- 12 -

The Fifth Circuit revisited the issue of § 363(b) sales in *Institutional Creditors of Continental Air Lines v. Continental Air Lines, Inc.* (*In re Continental Air Lines*, Inc.), 780 F.2d 1223 (5th Cir.1986). In addressing the question of plans sub rosa, the Fifth Circuit held that:

> Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan. At the same time, we fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation. Balancing these considerations, we *hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied*. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.

*In re Condere Corp.*, 228 B.R. at 627-8 (internal citations omitted, emphasis added). Counsel for Lexie Reese has not alleged any denial of protections that would otherwise be afforded pursuant to a reorganization plan.

The Agreed Cash Collateral Order addresses the debtor's use of cash collateral and other items of property, as well as adequate protection to be accorded to SNB. It approves SNB's waiver of any discharge objection. However, as a 341 creditors' meeting has not yet been held in this case, SNB's waiver does not affect any other creditor's right to object to Reese's discharge. The Court fails to see how the actions approved by the Court on the debtor's three motions in any way affects or impairs the vast panoply of rights accorded to the debtor and creditors in the chapter 11 plan process. Indeed, most any significant action taken in an individual's chapter 11 case could arguably be construed as a *sub rosa* plan, especially when it is clear that any proposed plan will be a liquidating plan. The various items of relief sought here under the debtor's three motions do not, in the Court's view, cross the line.

- 13 -

## **Conclusion**

In accordance with the foregoing, the Court approves the relief requested by the Motion to Accept and Sell and approves the terms of the Agreed Cash Collateral Order, as hereby qualified. In addition, the Court finds that, given no objections were filed to the Motion for Secured Credit; and in light of the Court's approval of the Agreed Cash Collateral Order (and SNB's subordination to $100,000 in secured credit), and upon consideration of the Motion for Secured Credit, such motion should be approved. The Court instructs counsel for Reese to submit orders on each of the three motions. All other relief is denied.

### End of Memorandum Opinion ###