

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 12, 2007**            **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JESSE LEE REESE, | § | CASE NO. 06-50133-RLJ-11 |
| | § | |
| DEBTOR | § | |

## MEMORANDUM OPINION

The Court considers the issues arising in connection with the second interim fee application of debtor's counsel, Mullin Hoard & Brown ("Mullin Hoard"), by which Mullin Hoard requests approval and payment of fees and expenses of $99,508.83. State National Bank ("SNB") objects to payment of the fees and expenses to the extent such payment exceeds the $100,000 agreed carve-out between the debtor, Jesse Reese ("Reese"), and SNB.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334(b); this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## Background

This chapter 11 case resulted from a workout agreement between the debtor, Jesse Reese (and four of his affiliated companies), and SNB entered into May 4, 2006. The agreement, titled "Workout and Settlement Agreement between State National Bank, Jesse Reese, Savage Area Farms, Inc., Fairview Area Farms, Inc., and C&R Gin, Inc.," stated that Reese (and his companies) are indebted to SNB under several notes and guarantees with a total amount owing as of May 1, 2006 of $1,714,978.64; that such indebtedness is secured by farm machinery and equipment, crops and FSA government farm program payments, and by a deed of trust lien covering approximately 4,324 acres of farmland (and stating that such deed of trust was subordinated to prior deeds of trust in favor of Rabobank Agrifinance, First City Servicing Corporation, and Plains Capital Bank). Ex. 6. The agreement further recited that the notes and guarantees were in default, and that SNB had asserted that Reese had used the 2005 cotton crop and its proceeds without the bank's consent. *Id*.

The workout agreement provided that Reese would file a chapter 11 proceeding and use the provisions of the Bankruptcy Code to perform an orderly liquidation of the bank's collateral, including the farmland, as a means to pay the indebtedness owed to SNB. *Id*.

To effect an orderly liquidation, the workout agreement provided as follows:

1. Reese would sign the tracts of real estate into the 2006 farm program administered by the Farm Service Agency and that up to $25,000 of program funds received by Reese and his companies could be used by Reese to pay a retainer fee to his attorneys to represent him in the chapter 11 bankruptcy case. *Id*.

2. SNB agreed that the balance of the FSA funds would constitute "cash collateral"

subject to its liens, and usage of the cash collateral would be addressed under an agreed order providing for the use of cash collateral in Reese's chapter 11 filing. *Id*. In particular, Reese would be allowed to use the cash collateral in accordance with an agreed-upon budget between the parties. *Id*. SNB would be granted a replacement lien against the crops growing or to be grown by Reese and his companies during the 2006 crop year. *Id*.

3. SNB agreed to subordinate its replacement lien against the crops and the 2006 FSA payments for up to $100,000 of additional secured trade credit to be obtained by Reese and his companies for planting, cultivating, and harvesting the 2006 crops. *Id*.

4. The parties agreed that Reese would prosecute appropriate motions with the bankruptcy court to effect the orderly liquidation and the sales contemplated by the agreement. *Id*. In this regard, SNB specifically consented to the "payment of reasonable and necessary attorneys' fees and other costs necessary to allow the sales to be closed to be paid from the proceeds of the sales of real property that are subject to its liens." *Id*. at 3.

5. To adequately protect SNB for the use of the farm machinery and equipment and other collateral, including the bank's cash collateral, Reese agreed to grant SNB a deed of trust lien against Reese's portion of the Jason's Deli property, a commercial piece of property located in Lubbock, Texas, that was the subject of a lease agreement between Reese and a corporation owned and operated by his son, Tyler Reese. *Id*. at 4. In exchange for granting the bank a deed of trust lien against the Jason's Deli property, the bank agreed that such lien would serve as adequate protection for Reese's use of farm machinery and equipment and other collateral during the course of the bankruptcy case and that it, the bank, would not pursue any objections or exceptions to Reese's discharge in the bankruptcy case. *Id*.

6. To allow Reese to file the chapter 11 case and to induce the firm of Mullin Hoard to undertake the representation of Reese in the chapter 11 case, SNB agreed to a "carve-out" of up to $100,000 from the proceeds of its collateral, including the replacement liens granted under the agreement, subject to the bank's right to review any fees and expenses for their reasonableness and necessity. *Id.*

The bankruptcy case was filed June 13, 2006. Upon motion by Reese, the Court, on July 13, 2006, approved an agreed order for use of cash collateral. Ex. 7. The agreed order incorporated the provisions of the workout agreement. Of importance here, subparagraph D of paragraph 10 of the order states that SNB "consents to the payment of reasonable and necessary attorneys' fees and other costs necessary to allow the sales to be closed to be paid from the proceeds of the sales of real property that are subject to its liens *in accordance with the provisions of 11 U.S.C. Section 506(c)*." *Id*. at 6 (emphasis added). It should be noted that the order further states that the pledge of the Jason's Deli property would constitute adequate protection for Reese's use of the bank's collateral, including cash collateral, and his use of the farm machinery and equipment, but shall not constitute additional security to the bank for its agreed carve-out of $100,000 for attorneys' fees and expenses, and shall not cross-collateralize any other indebtedness of the bank. *Id*. at 8.

A problem arose concerning the $25,000 retainer to be paid from the FSA government payments. According to Reese, he did not receive an FSA payment prior to the bankruptcy filing because he was unable to timely register the farmland in the program.[1] SNB and Reese then

---

[1] During the pendency of this bankruptcy case, Reese has also been going through a divorce from his wife, Lexie Reese. Reese's attorney contended that Lexie Reese did not initially consent to Reese registering the farmland in the farm program, which caused the delay.

agreed that Reese could use funds from a life insurance policy as a means to raise the $25,000. The sum of $20,092.56 was obtained from a life insurance policy that was apparently used for Reese's retainer with Mullin Hoard. Ex. 4. From this sum and other payments made by Reese prepetition to Mullin Hoard, Mullin Hoard was paid $24,941.56. *Id*.

For attorney's fees and expenses incurred during the bankruptcy case, Mullin Hoard has, as of this date, been paid the sum of $78,375.48, which represents fees and expenses approved by this Court's order of October 30, 2006 on Mullin Hoard's first fee application. There is still $329.29 owing under the first fee application. The application before the Court seeks approval of fees and expenses of $99,508.83 for time expended from September 26, 2006 to July 31, 2007. This represents fees incurred of $36,751 for work related to case administration/general bankruptcy matters; fees of $5,936 for work related to real property sales/farmland; fees of $30,967 relating to sale of the Jason's Deli property; and fees of $19,619 relating to work performed in connection with the plan and disclosure statement. This constitutes total fees of $93,273, with an additional $6,235.83 in expenses incurred. The request, therefore, is for approval *and payment* of fees and expenses in the amount of $99,838.12 (the $99,508.83 on the present application and the residual of $329.29 from the prior application).

In summary, David Langston ("Langston"), lead counsel, and his firm, Mullin Hoard, received pre-petition the sum of $24,941.56, of which $20,092.56 was derived from a life insurance policy owned by Jesse Reese; Langston and his firm have, as stated, been paid $78,375.48 on his prior fee application. In addition, Langston is presently holding in his firm's trust account the sum of $6,355.67 and SNB's firm, Sims Hubbert, is presently holding the sum of $15,268.85. These two sums, the $6,355.67 and the $15,268.85, are attributable to a check in

- 5 -

the amount of $21,624.52 that was issued by Crosby County Abstract out of the proceeds of the sale of farmland to the John and Colton English Family Trust. Ex. 5. The parties have stipulated that the $15,268.85 represents a disputed amount.

## Discussion

The dispute is as follows: Reese's counsel, Langston, contends that the $15,268.85 presently held by the Sims Hubbert firm should now be paid against his attorneys' fees as part of the $100,000 carve-out arrangement. He further contends that the balance of his fees sought should be paid from available funds and, to the extent such funds constitute proceeds of collateral that secures SNB, SNB should be surcharged for the payment under section 506(c) of the Bankruptcy Code. SNB contends that Mullin Hoard has already received the full $100,000 for the carve-out given the payment of the insurance proceeds pre-petition. SNB also argues that the $100,000 carve-out is the maximum amount to be paid out of encumbered funds to Mullin Hoard. In this regard, SNB submits that the $100,000 carve-out constitutes, in effect, the maximum of a section 506(c) surcharge that can be had in this case, and thus Mullin Hoard should not receive the $15,268.85.[2]

On the first issue – whether the $15,268.85 (representing, by agreement, a sum paid prepetition from the life insurance policy) must have already been credited against the $100,000 carve-out – all the Court knows from the evidence before it is that Reese did not obtain the FSA payments in time to pay the $25,000 retainer, that, instead, he was allowed to use funds raised from a life insurance policy to pay against the required retainer. SNB was aware of this and

---

[2]The Court cannot discern how the parties came up with the amount of $15,268.85 as a disputed amount. It is less than the amount paid prepetition from the life insurance policy ($20,092.56). But, given that the parties agree on the amount, the Court need not resolve the matter.

consented to it. SNB has presented no evidence suggesting that payment from the insurance policy must count against the carve-out. It appears, quite simply, that the insurance funds replaced the FSA payment. The FSA payment was not part of the carve-out amount. And, assuming the FSA payment was ultimately made to Reese and encumbered by SNB's liens, the Court fails to see any prejudice to SNB. The $15,268.85 presently held by Sims Hubbert does not count against the carve-out until paid to Mullin Hoard.

The second question is whether the carve-out constitutes the maximum amount of a section 506(c) surcharge claim. Both the workout agreement and the cash collateral order address this issue. They each contain a provision stating that SNB consents to a surcharge against the proceeds realized on the sales of real estate, with the cash collateral order specifically referring to section 506(c). The $100,000 carve-out is set forth in both the workout agreement and the cash collateral order as a separate provision. The carve-out was allowed to accommodate payment of reasonable attorney's fees and expenses incurred by Reese in the chapter 11 case generally. If the total fees and expenses did not exceed $100,000, then the carve-out provision would have subsumed the surcharge consent for real estate sales. The problem, of course, is that the total fees and expenses well exceed the carve-out. SNB argues that it is inequitable to allow a surcharge in excess of the $100,000, given the concessions it has made in the workout agreement and in the bankruptcy proceeding generally. While there may be some merit to this argument, the Court cannot deny the statutory right to surcharge upon arguments based solely on equity. An explicit waiver by Reese of a section 506(c) claim could have been included in the parties' agreement.[3]

---

[3] It has been noted that some bankruptcy courts believe that even a waiver of the right to surcharge under section 506(c) is "against public policy and unenforceable per se." *In re InteliQuest Media Corp.*, 326 B.R. 825, 830 n. 31 (10th Cir. B.A.P. 2005) (quoting *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D. N.H. 1993).

There is no dispute concerning the amount of fees requested or the reasonableness of the fees and expenses. Upon review of the requested fees and expenses, and considering the nature, the extent, and the value of the services provided, the Court is satisfied that the requested fees and expenses are fair and reasonable and should be allowed.

The question, then, is how much of the approved fees and expenses under the considered application will be subject to surcharge for purposes of payment. In this regard, the fee application specifically identifies the fees and expenses incurred in connection with sales of real estate. The application states that fees of $5,936 relate to work performed on sales of farmland and $30,967 concerns work on the sale of the Jason's Deli property. These amounts and the time expended are not questioned or objected to by SNB. These sales conferred a direct benefit on SNB, as lienholder against the property. The parties announced that Reese has accomplished sales of farmland having a gross value of $2,182,530, with proceeds paid to SNB of $693,451.72. *See* Ex. 3 at 8. The Court will therefore allow a surcharge to the extent of the fees and expenses sought that relate specifically to sales of real estate.[4]

The Court must address two other issues. First, Reese's counsel, in argument, suggests that the Court should allocate the payment that was made upon approval of the first fee application so that all amounts charged that relate to real estate sales ($15,944.50) would now count as part of a surcharge amount and not part of the $100,000 carve-out, thereby increasing the amount now available under the carve-out. The Court declines this invitation. The Court is not

---

[4]The Court recognizes that the purpose of SNB's lien against the Jason's Deli property is to adequately protect it against Reese's use of the farm machinery and equipment and other collateral of SNB during the bankruptcy case. The Court is not aware of an itemization of a loss from such usage amount, but assumes that if any loss is less than $30,967 (the fees allocated for the sale of the Jason's Deli property), any funds held from the sale of the Jason's Deli property that exceed the loss amount would be unencumbered.

aware of any authority to effect what is essentially a marshaling of the payment after the fact, and has not been cited to any authority for this. The entire amount paid, the $78,375.48, counts against the $100,000 allowed carve-out amount.

The second issue is one not explicitly raised by the parties. This concerns whether other administrative claims should be allowed to share in the amounts payable on account of the 506(c) surcharge. Without belaboring the analysis, the Court simply adopts the holding of *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061 (9th Cir. 2001). There the court held that the surcharge amount goes to the administrative claimant that conferred the benefit on the secured creditor. The court construed the payment as one made directly from the secured creditor to the claimant as opposed to a payment from the bankruptcy estate. *Id*. The other administrative claimants would only share under the priority scheme if the distribution was made from the bankruptcy estate. *Id*.

**Conclusion**

The Court approves Mullin Hoard's requested fees and expenses of $99,508.83 relating to time for services expended from September 28, 2006 to July 31, 2007. The Court further concludes that the disputed amount of $15,268.85 (and the undisputed amount of $6,355.67) may be paid and then credited against the $100,000 carve-out set forth in the workout agreement and the agreed cash collateral order. Finally, Mullin Hoard is granted a surcharge claim under section 506(c) against encumbered funds in the amount of $36,903, plus a pro rata share of the allowed expenses.

### End of Memorandum Opinion ###